Good morning. May it please the court. Laureen Martin, Deputy Corporation Counsel, on behalf of the officers Darren Agarano, Ryan Aikala, Stuart Kunioka, and Haliuda McKnight. The issue before this court is whether the officers are entitled to qualified immunity for the single five-second deployment of the taser. The taser was deployed on Jazelle Mattos after she assaulted Officer Aikala, who was attempting to make a lawful arrest of her husband, Troy Mattos. Officers were responding to a domestic violence call in which physical abuse of a family member had been reported. Domestic violence calls are a dangerous type of call for police. Well, maybe if you said that after she assaulted the officer, now isn't that a disputed fact? I mean, in terms of, obviously, at this particular stage, that in determining that the plaintiffs would be entitled to all inferences in their favor, and it would seem to me that the officer describes it as an assault, but she describes the conduct differently. So we have to give, so what are the facts if you give her all the inferences? Yes, the undisputed facts, according to the plaintiff, is that she put her hands up on Officer Aikala's chest, and she extended one or both of her arms, which would be an assault. She admits that. She doesn't use the word push, but that's what she admits. All right, and she describes being in proximity where their bodies are against each other, too? Yes. She says that she touched, she was asked, is it true that your hands touched the officer's chest? Yes. Both of your hands touched Officer Aikala's chest? Yes. That doesn't prove that it was sort of initiated by her. I mean, everybody was in very close proximity. It sounds like this was a very small, confined area. The fact that her hands were touching him doesn't mean that she sort of initiated the contact. Not every time we bump into each other trying to get onto a bus means that we've assaulted somebody. That may be true, and in giving the benefit of the doubt to the plaintiffs on that fact, it may be true that you could say, well, she's putting up her hands kind of in a defensive posture, but clearly once she extends her arms, that's not a defensive posture at all. Did she testify that she extended her arms? Yes. It's both in her answers to interrogatories and in her deposition she admitted to that. Do you have a cite to the record on that? Yes, I can find that. Okay, page 22 of the plaintiff's supplemental excerpts of record. She said, I put my hand up by my chest and extended my arm. It's about three-quarters of the page down. Is it your position that a five-second deployment of a taser can never constitute excessive force, or only that it may be deployed against someone who is actively interfering with a police officer? I think the five-second deployment of a taser could be excessive force under the right circumstances. For example, if there were protesters that were peaceful, weren't threatening to the officers, if the officers simply came up and decided to use the taser without warning perhaps. But in a case such as this where it's a dangerous situation for the officers and he has been assaulted, there's already been that aggressive contact, and there's already this resistance by the two plaintiffs. In that situation, it is not excessive. Well, it appears that, I guess it would be Jay Zell that, using Mattos, maintained that Officer Acala did not give her an opportunity to get out of the way when he moved forward to arrest Troy, the defendant. Well, he would have been the defendant in the criminal case, not the defendant here. Why does this not raise a material question as to whether Officer Acala could properly deploy the taser? Because she assaults him. Because he comes up. It's clear, even at the point where they tell Troy you're under arrest, if you look at what Jay Zell Mattos' claims happen, is she immediately, instead of stepping out of the way or being cooperative, what she's doing is trying to stop the arrest. She's saying, let's take it outside. Everybody calm down. Don't do this in my house. She's not being cooperative. And when the officer goes forward to, according to Jay Zell, goes forward to arrest Troy, that's when she pushes him. What evidence is there in the record of the training that officers receive when they're issued tasers? The evidence in the record for the training, which isn't before the court today on the county claim, but there is a little bit of evidence in the record, and that, I would say, is in Officer Acala's declaration where he talks about the training that he received, how long it took, that he had actually experienced the taser himself, so he would know what it felt like. Well, but is there anything in the record that talks about that, that obviously I think that officers are generally trained in force in terms of, you know, when they're allowed to escalate it, you know, going from, you know, when you might use a nightstick, when you might use, and where you might use a taser relative to, you know, obviously I think it would be somewhat common sense that there would be situations where you could use a taser where you couldn't shoot someone. Yes. It would seem to be a lesser form of force, but is there anything in the record about that? Yes. We did submit a declaration from an expert, Robert Bragg, which is in our excerpt starting page 143, and I know he talks about the levels of force and where the taser would fit into that level. Okay. I have a question about a different aspect of the problem. The officer was not invited into the house, right? That's correct. Was he authorized to go in? Yes. Yes, he was. Based upon the case law in the Ninth Circuit as well as state case law, it's clear that because of the type of call, this was a domestic violence call, and given the behavior of Troy Martos being evasive, being intoxicated, and his call-out to his wife and her non-response, and he goes into the house saying, wait right here, it was reasonable for Officer Agaranem to go inside. They don't stop him from going in the house. They don't tell him, no, don't go in. They let him go in. I'm aware of cases where if there's stuff going on in the house and the officers have reason to believe somebody's being hurt, they can go in. But do you have a case like this one where an incident happens outside, the party, I guess not even the suspect at that point, is allowed to go into the house and then the officers follow him? I know we cited a case which was similar, but I believe it involved an individual who was inside, as you mentioned, a hotel room. Well, that's why I asked the question. When the individual's inside and the officers have cause to believe there's violence going on, domestic violence and the like, then, you know, in a sense, there's no choice whether to go in. They have an emergency that they didn't in any way create, and so they have to go in and make sure that somebody isn't being injured. But he starts outside, and they are perfectly capable of saying, stop, don't go in, or possibly even apprehending him while he is inside. I mean, once he goes in and they have that kind of situation, they have no choice but to follow him because all of the facts that they knew at the time they went in, they had known before the husband actually entered the house, right? Is there anything they learned that made the emergency more likely after he went in? I think the call-out to Giselle and no response is an important factor. I thought that happened when he was... No, that happened when he was outside. That was the initial attempt to... You say no, but the question I was going to ask, if you'd let me finish... I'm sorry. You would have said yes. Wasn't he outside when we called? So you remember my question. I said, was there anything that happened after he went inside that made it more of an emergency or that created an emergency? Didn't all the facts, didn't everything that the officers knew, that they knew about the emergency status happened before he goes in the house, in which case don't they have a duty, if they're going to do anything at all, is to keep him from going in? Going into the house is apparently a major intrusion, and that's part of what happened here. They are not invited in the house. They go in not having been invited in the house. That creates a sort of a natural situation where there's resentment and resistance on the part of the homeowners, and that escalates into this kind of close encounter, which happens all the time when officers go into a house where there is possible domestic violence. You know this happens quite frequently. So how do the officers get justification for going in if they could have stopped the altercation by simply prohibiting or holding on to the husband or grabbing him or something before he has a chance to go in the house? I guess part of the problem with that type of argument is you really are kind of doing that 20-20 judgment hindsight. You realize now once he gets in that Troy Matos is upset. But the bigger issue in my mind is what alternatives did the officers have? They could have told him don't go in. But then they still don't have the ability to talk to Jay Zal either. Well, did they know she was okay at that time? No. My recollection of the facts were that the daughter called 911. They get there. They want to talk to her to see if she's okay. And what does he say? He calls out for her. There's no response. Exactly. Didn't he say something about her being in the shower? Yes. He said several things. One, when first confronted that there was a call, he said who called the neighbors? And they said no. The call was within the house. And then he admits that they had gotten into a fight. He doesn't want to talk about why. And then they say, well, we can't leave until we talk to your wife. Can you go get her? He calls out to her twice. She doesn't come out. And at that point they said, can you go get her? But the problem is how else are they going to talk to Jay Zal Matos? Somebody's got to go in and get her or try and get her. Well, did they know she's okay at that time? No, they don't. Well, there's lots of stuff they can do. Certainly sending him in, I mean, actually tell him go get her and then use that as an excuse for entering the house themselves, that sounds almost like a subterfuge. If they're going to go in looking for her, then obviously they don't need him going in first to create this dynamic where they're then caught between two possibly hostile parties. So that's, they could telephone, they could hold on to her and wait. They could go around the house and listen for showers and listen for, I mean, there's lots of things they can do. But once they send him in, you know, they have made it clear to themselves an excuse for entering the house. Let's say we look at this and we say, gee, they didn't really have a justification for going in. Does that affect analysis, I mean, as to the force claim? I don't believe so. The case law, as far as the arrests, say that even if the entry is not good, that the plaintiffs would not be justified in using force against the police officers, that they really need to submit to the force, even if the entry is not constitutional at that point. And if you say that they have to submit to the arrest and they're resisting it, then the force would be appropriate. So you see some police officer breaking into your house, a guy with a badge, you have to do whatever he says? Is that the rule? The case law seems to be saying that, yes, exactly. Because you don't want individuals making that determination on their own, saying, well, I think that you shouldn't have entered and now I'm justified using force against you. The justification for that rule is that they want the individuals to submit to the force and that if they have a complaint, then they're entitled to come back and try and get some kind of redress from it. But the rule is that they should submit. Even if the house, even if the entry is unlawful? Yes. Okay. Well, we'll hear from the other side. Good morning. Good morning. Eric Seitz appearing for the plaintiffs' appellees. And I would also like to introduce you to Monika Matos, who is here in court this morning. I, too, would ask you to look at page 22 of our excerpt because we're perfectly happy with those facts. And those are the operative facts for the purposes of this proceeding. If you read Ms. Matos' interrogatory answer, which was submitted early on in this litigation, she denies that there was ever any offensive touching. She denies that she intentionally did anything which would justify the use of force against her. An assault is not merely a touching. It's an offensive, intentional touching. And based upon Ms. Matos' rendition of the facts, there was no assault here. What are, just from your perspective, what, giving all inferences in terms of the plaintiff, what are her facts? Well, again, if you look at page 22, I can read you what she said. But basically, in essence, what she's saying is that She raised her hands and touched Officer Akala after he made contact with her. Yes. And that she did so to prevent her breasts from touching him in very close quarters. She didn't push him. She didn't assault him. She didn't intend to push him away or do anything. Well, what does, I mean, this thing is somewhat contradictory. How does she keep him from touching her breasts without pushing him away? She puts her hands up and she extends them. That's all. Just to hold him away from her. That is the inference.  And we believe that's the inference. Either she steps back, in which case she doesn't need to be touching him, or she's pushing him back, in which case she is pushing him. Well, what You know, this is sort of a, you know, simple physics, right? You know, two bodies, the distance between two bodies is the same. Whether, right? Well, were it so simple, perhaps we wouldn't be here arguing about it. But the fact of the matter is, as you have already recognized, this was very narrow, confined circumstances. Her husband was right up against her. There was no room for her to move back. That's what she testifies to. She could have simply stepped out of the way. Well, maybe she could have simply stepped out of the way. That's possible. But again, that's conjecture. What we have here is a situation where she says that there was no offensive touching on my part. Yes, there was a physical contact. But I'm not aware of the need for something to be offensive touching in order to be an assault. For a criminal charge of assault, it must be an offensive touching in the state of Hawaii. And it must be intentional. That's what the statute requires. No simple touching. Perhaps for a civil tort, that might constitute some sort of a cause of action. But for a crime in Hawaii, assault as crime is defined as an offensive touching. So too is harassment. Do you think an officer on the job is supposed to allow himself to be, that tortures are committed against him rather than do what's necessary to prevent it? No. So if it's a near tort, it's okay, he's got to take it? No. If he can't sort of be sure that he can look into her mind and prove a criminal intent, he's got to take it? I don't think so. No, that's not my argument. My argument is, however. I think it is. No, it's not my argument. My argument is, first of all, that there was no crime committed for which a justification of an arrest gave rise. You don't need a crime, you need probable cause. That's right. That there is either a crime or there is something that might amount to a tort. That's right. Or a intentional tort against the officer. It does not have to, and since the distinguishing element between those two and, let's say, an accident, has to do with what goes on in the mind of the person doing the touching, there's no way to get, you know, 100% proof. All you can do is look at the objective facts and say, there is a probable cause here for a criminal jury, or maybe a civil jury, to find that there's been either a crime or a tort. I agree, Judge. The stuff that goes on in her mind is really sort of irrelevant because, you know, it's not written anywhere. It doesn't appear before her head in a balloon or anything like that. Judge Kaczynski, I agree with you, but that's why it has to go to a jury because the facts here are not clear as to what took place and whether an assault occurred. It would have to go to a jury if the officer was suing her in tort or if she were being charged with a crime. Then it would have to go to a jury. For purposes of our case, all you have to have is probable cause. And since you can never get absolute proof as to that last element, the mental element, and there's not any probable cause, all you can look to is the objectively verifiable facts, the things that the officer can see and hear, and then ask the question, given all the facts that he can see and hear, is there some probable cause to believe that the jury could find her criminally guilty or that the civil jury could find her to have committed a tort? We're not here arguing about the arrest. We're here arguing about the use of force. And the facts that gave rise to the use of force are, at a minimum, contested. And therefore, end of story in this circuit. Well, but on qualified immunity, that isn't the end of the story. In terms of let's assume that on step one that it is contested, that there are disputed facts and all of that. Going to step two, it has to be clearly established at the time to a reasonable officer, can you tell me what you rely on to show that this was clearly established? I mean, let's assume the facts of what you're saying, that I think you said she put her hands up and that she raised her hands and touched Officer Acala after he made contact with her. Let's assume those to be the facts that are giving you all inferences. How was it clearly established at that time, given the other undisputed facts, that a reasonable officer would have known that he couldn't use a taser? Well, then the inquiry in that situation is, would a reasonable officer act as Officer Acala did in employing the degree of force that he did? The first argument I would make to you is that there are no facts of any sort in this case which would indicate that a reasonable officer would employ any force, period. Therefore, it doesn't matter what the degree of force was, but in this instance... Well, I think a reasonable officer would not, in a domestic violence situation where they come on there, would not want that the spouse that supposedly had been assaulted would not want that... I mean, officers don't like people putting their hands on them. I mean, they've got guns, they've got, you know... So a reasonable officer would not like that, even taking those facts. So how would... and what Judge Kaczynski is saying, how does the officer know that she just wants to protect her breasts as opposed to whether, you know, his story is obviously different than hers? The reasonable officer tells her, don't touch me, we're going to place you under arrest, and you need to cooperate with us. That's what the reasonable officer does. Now, we've quoted you at least one case where the use of a taser was a problem, which was the Stevens v. LeVette case, where the man was taken to jail. He went there voluntarily. He got into an argument with a police officer in jail about whether he was going to put on the clothes that the jail required, and the officer tasered him. That's an 11th Circuit case. But there are a number of cases since then which we did not cite, but we can find them and certainly send them to you. No, but they have to be cases at the time for the officer has... there's a requirement of fair notice to the officer. I understand. I understand. But there are basically cases that say in this circuit that if there is a dispute, if reasonable minds can differ as to whether a particular force, be it taser or some other, should have been used in that situation, then that's an issue which has to go to the jury. And in this situation, certainly reasonable minds would differ as to whether any force was necessary, let alone the use of a taser. Here you have a very small woman in her house with her seven kids. She hasn't caused any disruption or anything. She hasn't been responsible. Somebody in the house felt that what was going on warranted calling the police. Now, the police don't know, and police are often blamed for not giving sufficient weight to calls like that and then somebody winds up dead or injured. And then you've got a different lawsuit because they said, oh, it was just a kid calling when I'm going to take it seriously, or it was just domestic violence when I'm going to take it seriously. It's no big deal. Stuff like that happens all the time. So the police don't know. I mean, something happened in that household which is not the responsibility of the police. It caused some person to place a call of distress and saying there's something really bad going on that deserves police attention. That's what the police know. So when you say she didn't do anything, I don't know that she didn't do anything. As far as the police are concerned, the adults in the household of whom she was 50 percent did do something that sounded either loud or dangerous or could result in somebody being injured. And you can't make the assumption that because she's a small woman, I mean, because she's either female or small, she's not the one who's dangerous. But lots of people have wound up dead or injured making assumptions like that because small people can have knives, small people can have guns, small people can have training in martial arts. Small people often land a lucky punch that can take out an eye or break a nose or something like that. So I don't think we're sitting here second-guessing the situation. I don't think your client can claim to be totally faultless and all of a sudden finds herself in the middle of this nightmare that she did nothing to create. Somebody in that household did do something to create the situation. Don't you agree? Well, I don't agree, but we don't know. Why don't you agree? Because that's what it looks like to me. We don't know on this record, and that's because... We do know somebody called. We do know somebody called. We also know that when somebody calls and says essentially what they said, my mom and dad are at it, and I think that it is dangerous, that the police are at their peril if they don't take the steps necessary to stop whatever danger is going on. And I agree with that. We agree on that, right? Yes, we do. I mean, I don't think they like to go in and get in the middle between husband and wife and insert themselves into that kind of situation. I don't think this is the favorite thing police do. My guess, having seen a lot of these cases, is that this is very low on the list of things that police like to do, and they, God knows, they do a lot of unpleasant things. I'm sure this is very low on that list even then. So they get drawn in the situation and all of a sudden find themselves at close quarters with this person, as you say, admitting that she touches him and she essentially pushes him away. No, she doesn't say she pushed him away. That's not what she says. She's up, you know, but I guess we need to talk about that because I don't see how she says anything else. You have said, and you've said the record reflects, that she's up against her husband. She can't back off. You've said that she puts her hands out and she said that she stretches them out. No, I haven't said that. That's what she says at page 22. No, no, no, I understand. I mean, you agree that that's what the record says. Yes. That's what she says. Yes. So if she can't move back and if she touches somebody and then stretches out her hand, I don't see if she can't push back in the back how it is that she can't be pushing forward. And how do you stretch out your arm without increasing the distance between you and the other person? One body has to move back. Maybe both have to move back. Well, there's no evidence that the officer was pushed or moved back at all. And therefore, all that happened was she put her hands up in a defensive position and he then tasered her. And then he stretched out her hand. And then he tasered her. But you skipped the stretching out of the hand. No, she didn't say she stretched out her hand. She put her hands up in a defensive pressure in front of herself. Extended my arm, she says. Yes, extended like I'm gesturing to you right now with her hands up in front. Well, I'm sorry, but that does not look extended to me. Extended is like this. Well, again, that's – This looks to me like extended. This looks extended. Do you have some different definition of extended? No, but I think 12 people on a jury who when they hear the evidence and see it all basically demonstrated to them, when we have the opportunity to take the depositions of the police officers and present this, that they would be able to decide those facts to determine whether force was warranted in this case. But this is clearly, in our view, a case where no reasonable officer would employ a taser in such tight quarters based upon the facts that we believe are undisputed here. The other facts are all disputed. And for that reason, as you yourself have said in other opinions that you've written, that's a jury issue. And this is a jury issue here. And that doesn't – there's no different rule when we're talking about qualified immunity. Do you agree with opposing counsel that it doesn't matter whether the police were or were not provoked to be in the house? Well, let me just as a preliminary matter say Judge Ezra resolved that question. He resolved it against us. And I don't agree. But that's not before you right now. Judge Ezra granted summary judgment to the county on the entry. And we did not agree with that. And at some point we may be back here arguing that issue. But we do not believe that there was a proper entry. We do not believe that everything that followed from that was lawful. But for purposes of the issue we're now presenting, was your client's privilege to act vis-a-vis the officer any different if the entry was unauthorized than if it was authorized? My understanding is only to the extent that unlawful force was used against somebody, a person has a limited privilege to resist unlawful force. But we're not arguing that point here today. And I'm not prepared to tell you that there was resistance here on the part of my client or either one of them. That's not basically the concept that I think applies here. Here we're just simply dealing with the taser use and the fact that the employment of force in these cramp quarters under these circumstances was unnecessary and unreasonable. And we believe that a jury could so hold. And if a jury could so hold, then it has to go to the jury. Thank you. Would you like to take a minute for rebuttal? Thank you. I just wanted to address one point. Whether Jay Zalmatos intended an offensive touching or intended an assault really is not the issue. The issue is whether Officer Aikola reasonably perceived what Jay Zalmatos did. Let's say we agree with you that he reasonably perceived that. Could he have broken her arm? I mean, is there anything at all he could have done at that point? Could he have pulled out his gun and shot her through the head because she's dead? You laugh, but I'm asking you a question. I'm sorry. You want to take it seriously? I am. I apologize. This is serious stuff. Yes, I agree. I mean, could he break her fingers? No, I think that the force that he needs to use is to. Just answer my question. Yes. We'll get to the legal questions in a minute. Sure. Could he have taken her hands on him? Could he have taken her fingers back and broken them? If that's what he needed to do in order to gain control of the situation and in order to protect himself. So you say that, yes, he could have done that? Yes. I think so. Could he have broken her arm? Punched her in the face? I think he could have if he needed to use that force. If he reasonably believed he needed to use that force. I'm sorry. You keep adding these qualifiers. I'm asking you yes or no. You say if he needed to do this. We have a record that we have. I've changed one fact. And I'm asking you if you think he had qualified immunity to do that. He had the same justification that he had for using a taser. So, you know, adding this thing at the end really just distracts from the issue, which is, of course, what you're trying to do. But it doesn't help your case because if you don't answer my question, I'm going to hold it against you and your client. So I'm going to give you one more chance to answer the question. And if you don't want to, that's cool. I'm perfectly happy to decide the case without your question. Let's say everything is exactly the same, but instead of pulling out that taser, he breaks her arm. Okay, just gets it out of the lock and bends the elbow back so it swings out of the way. Can you do that? Yes. Here you go, Kat. Yes. How about pulling out the gun and clubbing her with it over the head? Hitting her with the gun, yes. Punching her in the face? Yes. Putting a bullet through her head? No. Why not? Deadly force. Ah, Supreme Court has told us there's no such thing as deadly force. Deadly force is no different from anything else. It's just all in a big continuum. Did you read last, you know, this is a very recent case. Deadly force is no different from any other force. I'm not familiar with that case. I'm sorry. But anything short of killing her would have been okay because she put her hand on his chest and extended her hand. Because he had a reasonable belief that his safety was at risk. And you think that a taser in any event is a reasonable response about putting a high charge of electricity, which is designed to drop a person to the ground? Yes. Yes. And I know we cited cases talking about the safety of it and that it has less injuries than other uses of force. There are also cases where people get killed with tasers, where people die. There's a big case in Canada right now for somebody who was killed in Vancouver Airport by four Mounties. You're probably familiar with that case. There's a case out of California where jurors returned a verdict against the manufacturer of the weapon and the police for somebody being killed. People get killed with tasers all the time. It's not the commonest reaction. I've been tasered and I'm here to talk about it. Not in a controlled situation, let's put it that way. And I know police get tasered to know what it feels like. But you'll agree that it is a pretty serious escalation to taser somebody. I think it's a pretty low level of force. And I think that because there is that conception, at least in me. Even though it carries a risk of death. I don't agree that it does carry the risk of death. Then how did those people die? I think that the problem is that you have somebody who died after being tasered. They were subjected to the taser and people will automatically connect the two. And it seems that the studies don't support that. That certain individuals, for whatever reason, they're suffering from excited delirium or other conditions. They are going to die regardless of what force you use on them. And it just happens that the taser right now. Do you know what excited delirium is? Yes. A term invented by the people who make tasers. It is not a scientific term. It is something that's used in defense strategy in cases where the manufacturer gets sued for injuries and deaths occurring from tasers. If you look it up, you'll find there is no scientific double type study that uses that term. But anyway, there it is. All right. Thank you, Your Honor. The case just arguably stands submitted.
judges: Kozinski, Bybee, Callahan